## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RHONDA E. FROST, | Case No. |
| Plaintiff, | |
| v. | |
| CITY OF ATLANTA, GEORGIA; ANDRE DICKENS, individually; DARIN SCHIERBAUM, individually; CHATA SPIKES, individually; and PETER AMAN, individually, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>CIVIL ACTION COMPLAINT</u>

Plaintiff, Rhonda E. Frost ("Ms. Frost" or "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

## <u>INTRODUCTION</u>

1.  Ms. Frost served the City of Atlanta as Deputy Director of Public Affairs, the second highest ranking position within the Public Affairs Unit of the Atlanta Police Department.  She brought to her a job an accomplished career in law enforcement and the private industry with extensive experience in various supervisory and management roles.

1

2.   Throughout Ms. Frost's employment with the City of Atlanta, she received objectively stellar performance reviews and had no disciplinary history.

3.   In September of 2022, Ms. Frost's daughter, a law school student at the time, posted a video on social media criticizing the City of Atlanta and the Atlanta Police Department regarding felony charges brought against a well-known figure in Atlanta (Chaka Zulu, manager of music artist Ludacris).  The social media video gained widespread viewing and prompted inquiries and scrutiny of the City of Atlanta, Atlanta Police Department, and its leadership.

4.   Immediately following Ms. Frost's daughter's video being posted, Ms. Frost began to be excluded from meetings, events, and trainings.  She was effectively prevented from doing her job.

5.   After Ms. Frost protested her treatment and requested assistance from her direct supervisor (Chata Spikes) and others in the chain of command, Atlanta Chief of Police Darin Schierbaum personally requested an investigation of Ms. Frost; she was then locked out of her office without notice and put on administrative leave for over seven months without updates or valid explanation.

6.   The City of Atlanta's Human Resources Director in charge of the investigation into Ms. Frost found, repeatedly, that she had not violated any rules or policies and recommended, repeatedly, that Ms. Frost be returned to work.

7.   Instead, after Defendants were unable to find any law or policy violations in their extended investigation to justify terminating Ms. Frost, they used the pretext of a reduction-in-force ("RIF") to terminate her position and rob her of due process and the ability to contest her termination.  Following the elimination of Ms. Frost's job, Defendants have continued to use their influence to prevent Ms. Frost from obtaining gainful employment elsewhere.

8.   Defendants unlawfully retaliated against Ms. Frost for her association with her daughter and her daughter's free speech, in violation of the U.S. Constitution's First Amendment protections of free speech and association. Defendants also retaliated against Ms. Frost for protesting her treatment to, and filing a complaint with, the Equal Employment Opportunity Commission, in violation of Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

9.   This action arises under the United States Constitution, including the First and Fourteenth Amendments, as well as federal statutes including the Civil Rights Act of 1871 (42 U.S.C. § 1983), and Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. § 2000e et. seq.).  The United States District Court for the Northern District of Georgia has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims brought herein constitute a federal question under the laws of the United States. This Court has supplemental jurisdiction over

Ms. Frost's state law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all Defendants reside in the state of Georgia, some or all of the Defendants reside in this district, and a substantial part of the events or omissions giving rise to Ms. Frost's claims occurred in this district.

## **THE PARTIES**

11. Plaintiff, Rhonda E. Frost, ("Ms. Frost" or "Plaintiff") is a resident of Georgia.

12. Defendant, City of Atlanta, Georgia ("COA") is a body politic which can sue and be sued and is subject to the venue and jurisdiction of this Court. COA adopted the policies and procedures described herein and is responsible for their enforcement against Ms. Frost. COA acted by and through its executive officers, directors, managers, and other agents.

13. Defendant Andre Dickens ("Mayor Dickens" or "Mayor") is, and at all relevant times was, Mayor of the City of Atlanta, Georgia. Mayor Dickens acted personally and through his representatives, executive officers, directors, managers, and other agents.

14. Defendant Darin Schierbaum ("Chief Schierbaum") is, and at all relevant times was, the Chief of the Atlanta Police Department ("APD"). Chief Schierbaum

4

acted personally and through his representatives, executive officers, directors, managers, and other agents.

15. Defendant Chata Spikes ("Director Spikes") is, and at all relevant times was, the Director of the Public Affairs Unit for the APD. Director Spikes acted personally and through her representatives and other agents.

16. Defendant Peter Aman ("Chief Administrative Officer Aman") is, and all relevant times was, the Chief Administrative Officer of the APD. Chief Administrative Officer Aman acted personally and through his representatives and other agents.

17. At all times relevant herein, Defendants COA, Mayor Dickens, Chief Schierbaum, Director Spikes, and Chief Administrative Officer Aman were the agents, employees, managing agents, supervisors, co-conspirators, joint employers, alter ego, and/or joint venturers of the respective other Defendants, and each of them, and in doing the acts or omissions alleged herein, were acting at least in part within the course and scope of said agency, employment, conspiracy, joint employment, alter ego status, and/or joint venture and with the permission, consent, and/or ratification of each of the other Defendants. Defendants COA, Mayor Dickens, Chief Schierbaum, Director Spikes, and Chief Administrative Officer Aman are collectively referred to as "Defendants."

5

18. Whenever and wherever reference is made herein of any act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

19. Whenever and wherever reference is made to individuals who are not named as Plaintiff or Defendants in this complaint but were agents, servants, employees and/or supervisors of Defendants, such individuals at all relevant times acted on behalf of Defendants within the scope of their employment.

## ADMINISTRATIVE EXHAUSTION

20. Ms. Frost properly exhausted her administrative remedies by timely filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of right to sue letter from the EEOC.

## FACTS

21. Ms. Frost's work experience spans over thirty (30) years, with nineteen (19) of those years in law enforcement and public affairs. She started her career as a correctional officer with the California Department of Corrections at San Quentin State Prison and was promoted through the ranks with positions of increased responsibility in supervisory and management roles such as sergeant, lieutenant, senior investigator, public information officer, ombudsman (A), and rose to the level

of captain (A) before relocating to Georgia with her family to join her daughter and grandchildren.

22. Upon moving to Georgia, Ms. Frost ventured into small business, bought a home, and went back to college to obtain her undergraduate and graduate degrees before returning to her roots in the field of law enforcement and working for the Atlanta Police Department ("APD").

23. In or about August of 2019, APD hired Ms. Frost in the position of Public Information Officer.  Within thirty (30) days of being hired, APD promoted her to Deputy Director of Public Affairs.  Deputy Director was the second highest ranking position within the Public Affairs Unit of the APD ("PAU").

24. Since 2020, Chata Spikes ("Director Spikes") has been Director of the PAU and was Ms. Frost's direct supervisor.

25. Throughout Ms. Frost's years of employment, she performed her job well and consistently received high marks and positive recognition.  Ms. Frost never received any official discipline and, to her knowledge, never had any formal complaints filed against her, nor was she the subject of any formal investigation until the events giving rise to this action.

26. In or about late summer of 2022, on Ms. Frost's final annual evaluation, for the year ending on June 30, 2022, Director Spikes rated Ms. Frost the highest value

available, "Outstanding" for each of the eight (8) separate categories in her evaluation, including additional comments such as:

    a.  "Rhonda [Frost] upholds the Department's reputation by ensuring that our officers are recognized and promoted in a positive light";

    b.  "Rhonda does a great job at ensuring the [PAU] Director and all members of the unit are well informed and up-to-date on pertinent situations";

    c.  "She ensures the unit is always evolving and she does a great job of balancing the fast paced duties and responsibilities of the unit";

    d.  "Rhonda takes charge of her responsibilities, providing clear instructions to subordinates"; and

    e.  "Rhonda works very well with others, both internally and externally."

### *The Chaka Zulu Attack and Social Media Posts by Ms. Frost's Daughter*

27. On or about June 26, 2022, Ahmed Chaka Zulu Obafemi ("Chaka Zulu"), a public figure within Atlanta and manager of music artist Christopher "Ludacris" Bridges, was involved in a shooting in Atlanta, Georgia.

28. Chaka Zulu was attacked by four men in an alleged robbery attempt. As Chaka Zulu recovered to his feet from his attackers, he shot and killed one of his assailants. Chaka Zulu was also shot in the back by one of the suspects as he attempted to retreat into his business.

29. On or about September 13, 2022, Chaka Zulu was arrested by the APD and charged with murder, aggravated assault, possession of a firearm during the commission of a felony and simple battery.

30. Both the shooting and the charging of Chaka Zulu with crimes in relation to the shooting were of significant interest to the public and media.

31. Ms. Frost's daughter, Shanae Hall ("Ms. Hall"), a law school student at the time, secured a copy of a business' video surveillance footage showing the Chaka Zulu attack.

32. On or about September 18, 2022, early in the morning, Ms. Hall posted a video on social media containing some of the video surveillance footage she had obtained of the Chaka Zulu attack (described *supra*), as well as her analysis of the video and opinion that Chaka Zulu should not have been charged.  Ms. Hall questioned APD's motives and the apparent lack of prosecution regarding Chaka Zulu's attackers.  The video quickly gained widespread viewing by the public.

33. On or about October 9, 2022, Ms. Hall posted a second video on social media about the Chaka Zulu attack (described *supra*), providing further analysis of the attack and criticism of APD for its actions, including the apparent failure to arrest one of the attackers who also attacked a female victim and APD's apparent failures in documenting the attack.

34. On or about January 9, 2022, Ms. Hall posted a third video on social media about the Chaka Zulu attack (described *supra*), criticizing APD, Mayor Dickens, and APD Chief Schierbaum for apparently allowing the violent men responsible for attacking Chaka Zulu to remain free without being arrested.

35. The charges against Chaka Zulu in relation to the attack were eventually dropped, as Ms. Hall had argued was proper.

36. At APD, Ms. Hall was known to be Ms. Frost's daughter, having attended various work and social outreach events together.  Additionally, Director Spikes knew Ms. Hall was friends with Chaka Zulu.

### *Ms. Frost is Prevented from Working Following Her Daughter's Public Posts*

37. On or about September 18, 2022, immediately following the posting of Ms. Hall's social media video (described *supra*), the PAU was flooded with media communications regarding the Chaka Zulu attack.  A series of meetings took place with Chief Schierbaum, Director Spikes, other APD commanders, and representatives from the Mayor's office.  Despite Ms. Frost's position (as second in command in the PAU and key person in the organization), Ms. Frost was not invited to attend any of these meetings.  Around this time, Director Spikes discussed the connections between Ms. Frost, Ms. Hall, and Chaka Zulu with the Mayor's office.

38. Following the posting of Ms. Hall's social media video (described *supra*), Defendants began excluding Ms. Frost from meetings, training opportunities, and

events, including ones she was previously scheduled to attend.  For example, Ms. Frost was not permitted to attend mandatory training occurring in the Mayor's office, limited in responding to public affairs issues, and removed from a Civilian Recognition breakfast.

39. As a result of the aforementioned actions, Ms. Frost was essentially prohibited from performing her job duties as Deputy Director.  Instead, subordinates were often invited in her place.

40. Following the posting of Ms. Hall's social media video (described *supra*), the workplace became extremely tense for Ms. Frost.  In addition to being prohibited from performing her job duties (described *supra*), she was excluded from communications as part of the team and she received vague threats against her.  For example, Director Spikes would tell Ms. Frost, "you know they want me to write you up," without specifying who the "they" were or for what alleged misconduct Ms. Frost should receive discipline.

41. In or about November of 2022, after Ms. Frost's attempts to rectify the issues within the PAU were unsuccessful, she reported being excluded from meetings and trainings to APD Assistant Chief Carven Tyus.  Ms. Frost asked Assistant Chief Tyus for assistance in mediating the matter.  Assistant Chief Tyus assured Ms. Frost that there would be a meeting to address the issues she raised, however, that meeting never happened.

42. On or about November 30, 2022, Chief Schierbaum requested an investigation of Ms. Frost from COA's Director of Human Resources, Patrick Pendleton ("HR Director Pendleton").  The initial purported justification for the investigation was Ms. Frost's job performance and/or interactions with other employees (despite Ms. Frost having received no official disciplinary actions and only stellar reviews on her latest performance evaluation, described *supra*).  The scope of the investigation appeared to shift over time, as no wrongdoing by Ms. Frost could be found.

43. Following Chief Schierbaum's request for an investigation of Ms. Frost (described *supra*), Ms. Frost was ordered to work from home.

44. On or about Sunday, December 4, 2022, Ms. Frost returned to the office to retrieve some materials she needed to work from home, only to find she no longer could access the building.  Ms. Frost reported the issue yet received no explanation.

45. On or about December 7, 2022, Ms. Frost was placed on paid administrative leave, purportedly "until the [Department of Human Resources] inquiry requested by [Chief Schierbaum]…is completed."  The purported reason for the inquiry was "concerns and complaints being raised regarding your interaction with subordinates and other departmental employees."  Upon information and belief, it was extremely unusual for an employee to be put on a several-months long administrative leave to investigate alleged issues for which the employee (Ms. Frost) had never received

any formal disciplinary action (at all relevant times, COA had in place a progressive discipline policy).

46. Over the ensuing nine (9) months, Ms. Frost remained employed but was never permitted to work again, nor was she afforded a hearing or chance to respond to any allegations being made against her. She remained on administrative leave and was subsequently terminated (under the pretext of a Reduction in Force), all despite the investigation into her concluding – *repeatedly* - she had violated no policies or rules and should be returned to work.

47. Throughout the time Ms. Frost was on administrative leave and being investigated, Ms. Frost inquired with Defendants and their representatives about the reason for the investigation and why she could not return to her job. Ms. Frost was never told what specific conduct she was being investigated for and she was never interviewed. Much of her understanding of the investigation came from subsequent open records requests.

48. In or about December of 2022, after being put on administrative leave, Ms. Frost complained about Defendants' actions to the EEOC.

49. On or about March 2, 2023, regarding the investigation into Ms. Frost, HR Director Pendleton conveyed by email his recommendation to return Ms. Frost to work because "**she has not violated any COA policies or rules** and there was no consistent documentation and communication on her performance or lack thereof."

(emphasis added).  Pendleton said Chief Schierbaum's options were to reassign Ms. Frost and/or work out her new assignments with her supervisor, with written expectations for accountability.  Pendleton concluded that Ms. Frost should have her APD access restored and be provided with "a return to work order…**ASAP**." (emphasis added).  Nowhere in the communication does Pendleton say that Ms. Frost can or should be terminated; a reduction in force is never mentioned.

50. Despite HR Director Pendleton concluding that Ms. Frost violated no rules or policies and should be returned to work (described *supra*), she was not returned to work and, instead, the investigation into her continued.

51. On or about April 24, 2023, regarding the ongoing investigation of Ms. Frost, APD's Chief Administrative Officer Peter Aman asked HR Director Pendleton to interview APD Major Peek to see if there was any unauthorized access of APD video databases (apparently to see if Ms. Frost had obtained the video footage that her daughter used in social media videos about the Chaka Zulu attack, described *supra*). Ms. Frost never accessed or provided her daughter (Ms. Hall) with any video footage regarding the Chaka Zulu attack.  In Ms. Frost's job position with the APD, she did not even have the ability to access the video databases in question.

52. In an internal memorandum dated May 15, 2023, HR Director Pendleton wrote to Tarlesha Smith, COA Commissioner of Human Resources, detailing his months-long investigation into Ms. Frost and stating that "**APD Police Chief**

**Schierbaum is requesting RIF [Reduction in Force] of Rhonda Frost…effective immediately**."  In the same memo, Pendleton states "**there is cause for concern regarding Ms. Frost's current status due to a social media incident initiated by her daughter who is not an employee of the COA**," and that "**Ms. Frost has a daughter who engaged in media posting negative things about COA APD about a homicide case**."  After Pendleton details the investigation he conducted, instead of agreeing with the requested course of action by Chief Schierbaum (terminating Ms. Frost through a RIF), Pendleton states "**[my] proposed resolution is to bring Mrs. Rhonda Frost back to work from administrative leave as she has not violated any COA policies or APD SOPs/rules.**"  Pendleton goes on to state "[d]ecisions should also be made in an effort to refrain from inadvertently having the appearance of retaliation."[1]

53. Despite HR Director Pendleton concluding *again* that Ms. Frost violated no rules or policies and should be returned to work (described *supra*), she was not allowed to return to work.

---

[1] Pendleton's memorandum provides further insight into the changed focus of the investigation with the following sentence: "Director Spikes sent OPS a list of concerns related to a homicide case about Mrs. Frost daughters [*sic*] posts about the homicide case and Mrs. Frost trying to gather information from an APD detective on an active case for her daughter (an active social media poster)."  The allegation was false; Ms. Frost never tried to gather information from an APD detective or any other APD source for the purpose of her daughter's social media.

54.  On May 27, 2023, Ms. Frost signed and filed a Charge of Discrimination with the EEOC against Defendants for preventing her from doing her job (described *supra*).

### *Defendants Terminate Ms. Frost Through a Pretextual RIF*

55. On or about July 10, 2023, Defendants served Ms. Frost written notice that she was losing her job due to a RIF, in connection with a reorganization of the PAU, "based on needed efficiency and effectiveness priorities identified by the Chief of Police."   On the same date, Ms. Frost had her work cell phone, laptop, and identification card confiscated. Ms. Frost was told she had sixty (60) days to find another opportunity of employment, within or outside of COA.  She was terminated following that period.

56. The RIF and termination of Ms. Frost was flagrantly a pretext for unlawful retaliation considering:

  a.  The purported RIF and reorganization of the PAU created positions that Ms. Frost was qualified for, but was never considered, despite her seniority and excellent performance evaluations (in violation of COA policy);

  b.  There was no budgetary or lack of work justification for terminating Ms. Frost, as an individual from outside COA employment (David

Huddleston) was hired in Ms. Frost's place to work less hours than Ms. Frost, with higher overall pay;

c.  Defendants only subjected Ms. Frost to the RIF after the months-long investigation into her found no wrongdoing and recommended she be returned to work (described *supra*); and

d.  By characterizing Ms. Frost's termination as a RIF instead of a termination, under COA policy, Defendants deprived her of the right to be heard regarding her termination.  *See* Code Sec. 114-530.

57. Following Ms. Frost being terminated from her job position, Defendants have continued to use their power and influence to retaliate against her for her daughter's speech and prevent Ms. Frost from obtaining comparable employment.  By way of example, in or about August of 2023, when Ms. Frost sought a job position with Dekalb County, upon information and belief, Defendants (in particular Director Spikes) negatively characterized how Ms. Frost's employment ended, including alleged issues involving social media postings (which were related to Ms. Frost's daughter's protected speech).

58. Ms. Frost therefore believes and avers Defendants prevented her from performing her job duties and ultimately terminated her because of her association with her daughter (Ms. Hall) and her daughter's free speech and/or in retaliation for her complaints about Defendants to the EEOC.

## <u>FIRST CLAIM FOR RELIEF</u>

### <u>Violation of First Amendment Rights</u>

### <u>(42 U.S.C. § 1983)</u>

**Against All Defendants**

59. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

60. The Free Speech Clause of the First Amendment of the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, protects the right of government employees to speak as citizens on matters of public concern.

61. The First Amendment of the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, protects the freedom of association.  Freedom of association includes the right to enter into and maintain certain intimate human relationships, such as between a mother and daughter. Freedom of association also includes the right to associate for the purpose of engaging in activities protected by the First Amendment, such as speech.

62. Defendants retaliated against Ms. Frost and terminated her for the speech of her daughter, violating Ms. Frost's First Amendment rights.

63. Ms. Frost brings this action for deprivation of rights pursuant to 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

### Title VII – Retaliation

**Against Defendant COA**

64. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

65. At all times relevant to this action, Ms. Frost was an "employee" covered by the protections of Title VII.

66. At all times relevant to this action, Defendant COA was an "employer" within the meaning of Title VII.

67. Ms. Frost complained to the EEOC about Defendant's actions while she was employed.

68. Defendant subsequently terminated Ms. Frost for pretextual reasons (described *supra*).

69. Defendant's conduct constitutes retaliation, in violation of Title VII.

## THIRD CLAIM FOR RELIEF

### Violation of Due Process

### (42 U.S.C. § 1983)

**Against All Defendants**

70. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

71. The Fourteenth Amendment of the U.S. Constitution requires that no State shall "deprive any person of life, liberty, or property, without due process of law."

72. Under Georgia law, a public employee has a property interest in employment when that employee can be fired only for cause.

73. Ms. Frost could only be terminated from her employment for cause.  *See* Atlanta Code of Ordinances Sec. 114-528.

74. The Due Process Clause of the Fourteenth Amendment requires that States provide fair procedures and an impartial decision-maker before infringing on a citizen's interest in life, liberty, or property.

75. The Due Process Clause of the Fourteenth Amendment also requires that states give employees with protected property interests in their jobs notice of the charges against them, an explanation of the employer's evidence, and a meaningful opportunity to present their side of the story.

76. By falsely characterizing the termination of Ms. Frost as a RIF, Defendants effectively circumvented any procedures in place to ensure that Ms. Frost received due process.

77. Ms. Frost was never afforded the opportunity to be heard regarding any allegations against her.

78. Defendants' termination of Ms. Frost violated her due process rights.

79. Ms. Frost brings this action for deprivation of rights pursuant to 42 U.S.C. § 1983.

## FOURTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### Against All Defendants

80. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

81. Ms. Frost has suffered severe emotional distress as a result of Defendants' conduct.

82. Defendants' conduct was intentional, reckless, extreme, and outrageous.

83. Defendants' conduct was the proximate cause of Ms. Frost's emotional distress.

84. Accordingly, Defendants are liable for intentional infliction of emotional distress.

## FIFTH CLAIM FOR RELIEF
### Libel and Slander
### (O.C.G.A §51-5-1, *et seq.*)
### Against Director Spikes

85. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

86. Director Spikes made false and malicious statements about Ms. Frost, orally and in writing, including, upon information and belief, during the investigation into

Ms. Frost and the allegation that Ms. Frost attempted to obtain information from the APD for her daughter's social media usage (described *supra*).

87. Director Spike's false statements injured Ms. Frost's reputation and standing in her profession and in the community, causing her damages.

88. Accordingly, Director Spikes is liable for libel and slander.

## <u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiff Rhonda E. Frost respectfully requests that this Court enters judgment in her favor and grants her the following relief:

1. Order Defendants to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary/pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

2. Award Plaintiff pre-judgment and post-judgment interest;

3. Award Plaintiff damages for emotional distress, pain and suffering;

4. Award Plaintiff liquidated damages for Defendants' willful violations, to the extent available under applicable law;

5. Order Defendants to pay punitive damages as appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct,

and to deter Defendants or other employers from engaging in such misconduct in the future;

6.  Award Plaintiff all reasonable costs and attorneys' fees incurred in connection with this action;

7.  Award Plaintiff injunctive relief to prohibit unlawful conduct in the future;

8.  Award Plaintiff such other and further equitable and legal relief as appropriate under the circumstances; and

9.  Grant Plaintiff a trial of this matter by jury.

Respectfully submitted, this 18th day of March, 2024.

/s/A. J. Mitchell
A. J. Mitchell
Georgia Bar No.: 512269
*ATTORNEY FOR PLAINTIFF*
**Law Offices of A. J. Mitchell, LLC**
2388 Scenic Hwy S,
Snellville, GA 30078
Email: aj@ajmitchell-law.com
Phone: (770) 972-6623
Facsimile: (404) 592-6821

/s/Mark Tieman
Mark Tieman*
*\*Pro hac vice application to follow*
*ATTORNEY FOR PLAINTIFF*
California Bar No.: 344822
New Jersey Bar No. 155692016
Email: MDTieman@gmail.com
Phone: (610) 207-8427